**Cameron Jennings DODSON, Plaintiff,**

v.

**Janet RENO et al., Defendant.**

**Civil No. 95–2557 (HL.)**

United States District Court,
D. Puerto Rico.

Feb. 25, 1997.

David W. Roman, Guaynabo, PR, for Cameron Jennings-Dodson.

Cameron Jennings-Dodson, San Juan, PR, pro se.

Esther Castro-Schmidt, Agnes I. Cordero, U.S. Attorney's Office, District of P.R., Criminal Division, Hato Rey, PR, for Janet Reno, Kathleen Hawk, Pete Carlson, G.L. Ingram, James Burrell, Al Garcia, John Tombone, Jose Santana, Ismael Laborde and Rolando Rosa.

## OPINION AND ORDER

LAFFITTE, District Judge.

Plaintiff, Cameron Jennings Dodson, is currently incarcerated in the Metropolitan Detention Center ("M.D.C.") in Guaynabo, Puerto Rico. He filed the instant *Bivens* suit seeking monetary and injunctive relief because he is fearful that Defendants will transfer him to a federal penitentiary in the United States where he alleges that he is likely to be killed by his former cohorts in the Aryan Brotherhood.

Before the Court is Defendants' motion for summary judgment on the grounds that (1) they never received a copy of the full complaint, (2) the Marshal's Office never properly served the United States of America pursuant to Rule 4(i), (3) they have qualified immunity, (4) Dodson's request is moot, and (5) there is no evidence that Defendants were deliberately indifferent to his status as an ex-member of the Aryan Brotherhood.[1]

Dodson, appearing *pro se*, insists that Defendants are indifferent to his safety based on the prior actions of officials in other penitentiaries and Defendants' attempt to transfer him to the United States Penitentiary in Marion, Illinois.[2] After analyzing Dodson's significant claims carefully, the Court finds that Dodson's complaint is **moot** and, furthermore, Dodson is unable to meet the strict prerequisites to establish an Eighth Amendment violation. Accordingly, the Court **grants** Defendants' motion and enters judgment accordingly.

## FACTS

Cameron Jennings Dodson, an inmate at the federal Metropolitan Detention Center in Puerto Rico, has two advantages at this stage in the litigation proceedings. First, because he is appearing *pro se*, the Court must interpret the allegations in his complaint liberally. *Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 12 (1st Cir.1990). The Court is obligated to overlook the legal mistakes that may prove fatal to a plaintiff represented by an experienced attorney. For example, despite the fact that Dodson sued Defendants under section 1983, the Court denied Defendants' motion to dismiss on the grounds that Dodson stated a cognizable *Bivens* claim. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Dkt. No. 27. Second, under the well-established standard of review for Rule 56 motions, the Court shall assume that Dodson's allegations are true when properly supported by reference to the Record and draw all reasonable inferences therefrom in his favor. Dodson,

---

1. Defs.' Mot. Summ. J., Dkt., NO. 31.

2. Pl.'s Opp'n Mot., Dkt. No. 32. Although Dodson is appearing *pro se*, he has demonstrated an impressive ability to express the current state of the law and argue persuasively for injunctive relief. Although the Court shall afford Dodson all the benefits that the law grants him for appearing *pro se*, Dodson's skills undoubtedly sharpened the legal issues required for adjudication.

of course, may not rest his case on mere speculation or improbable inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); Local Rule 311.12.

Because of Dodson's conviction for being a felon in possession of a firearm, Dodson must spend the next ten years of his life in the federal prison system. His projected release date is May 5, 2007. Since his conviction, he has been transferred from one federal penitentiary to another. This has been largely due to his status as a former member of the Aryan Brotherhood. Apparently, the Aryan Brotherhood believes that he has been a confidential informant for the Government and has placed a "contract" on his life. The Aryan Brotherhood has a network of members throughout the federal penitentiaries of the United States. They are a credible threat to the safety and welfare of their enemies. Special precautions must be taken to protect the lives of their enemies, such as keeping an inmate in segregation or transferring an inmate to a prison like the M.D.C. without Aryan Brotherhood members.

As a result of his conviction, Dodson was first incarcerated in the United States Penitentiary in Lompoc, California. On December 3, 1992, however, he was stabbed by members of the Aryan Brotherhood in the general prison population. As a result, the prison authorities placed Dodson in segregation and on March 9, 1993 transferred him to the United States Penitentiary in Terre Haute, Indiana. For reasons which are not clear from the record, on June 17, 1993 the authorities subsequently transferred Dodson to the United States Penitentiary in Atlanta, Georgia where he was once again assaulted by the Aryan Brotherhood in the general prison population. To protect Dodson's life, the prison officials again placed him in segregation. On August 10, 1993, the officials issued a Central Inmate Monitoring Report that recognized the Aryan Brotherhood's threat to Dodson and recommended separation from the Brotherhood. Pl.'s Compl., Dkt. No. 1 at Ex. P.

On January 17, 1994, the prison officials transferred Dodson to the M.D.C. in Guaynabo, Puerto Rico. Without special precautions, it was clear that the Aryan Brotherhood in the federal penitentiaries of the United States was a threat to Dodson's life. According to the Warden of the M.D.C., J.A. García:

> [Dodson] was transferred to this facility because the Federal Bureau of Prisons (BOP) has determined that inmate Dodson's life might be in danger if he is designated to a federal correctional facility which houses members or associates of the Aryan Brotherhood (prison gang). Presently, MDC Guaynabo does not have Aryan Brotherhood members or associates among its population. Accordingly, while being housed at this facility, he has lived in general population without being involved in incidents threatening his safety.

Aff. J.A. García, Dkt. No. 23 at Ex. D. The federal prison officials recognized the Aryan Brotherhood's threat to Dodson's life in any federal facility where the Aryan Brotherhood had a strong presence. Dodson's transfer to the M.D.C., therefore, was a protective measure designed to safeguard his health and well-being.

The M.D.C. is a nine story building designed to house pre-trial and holdover inmates from the District of Puerto Rico and the District of the United States Virgin Islands. It also houses a designated work cadre of long-term inmates, inmates pending I.N.S. deportation, and Puerto Rico state boarders. The building is an archetypal example of a modern prison facility. It has four floors with three wings on each floor. The first three floors contain seven male wings and two female wings. The fourth floor contains the special housing unit and housing for male juveniles who are pending trial as adults. The M.D.C. offers a series of programs to help the inmates including a parenting program, educational programs, recreational activities, a substance abuse program, and religious services. Pl.'s Mot., Dkt. No. 28 at Ex. A.

Despite what the M.D.C. has to offer, Dodson did not like the transfer. Undoubtedly, he preferred living in the M.D.C. as opposed to a federal penitentiary where the Aryan

Brotherhood could threaten his life. Unfortunately, the M.D.C. was not his first choice. Dodson wanted to finish his final ten years in a state prison close to his family in Washington. He asked the M.D.C. authorities for their help. Pl.'s Compl., Dkt. No. 1 at Exs. G & H. Warden García and several M.D.C. officials, including co-defendants Jose Santana and John Tombone, attempted to help Dodson. They decided that "[d]ue to the limited available programs for designated inmates in MDC, Guaynabo, the structural layout of the institution and the length of time that inmate Dodson has remaining to serve," they would request the transfer. *Id.* at Exs. C & D.

On June 12, 1995 and November 5, 1995, they referred Dodson's case to the Southeast Regional Office of the Bureau of Prisons and the Central Office of the Bureau of Prisons. On Dodson's behalf, they requested his transfer to a state prison in Washington. *Id.* at Ex. C & D. Unfortunately for Dodson, the Assistant Director of the Central Office denied both requests. *Id.* at Ex. E. It is possible that the state prison authorities in Washington refused to accept Dodson because of his prior record of escaping from the Spokane, Washington County Jail and a minimum security prison in the State of Washington. *Id.* at Ex. C. While Dodson waited for his transfer, he worked as a unit orderly and behaved himself well. *Id.* at Exs. A & F. His unit team recommended correctional counseling, recreational activities, religious programs, and computer classes to him. *Id.* at Ex. A. Dodson participated in the recreational programs. *Id.* at Ex. F.

While the M.D.C. attempted to help Dodson transfer to a state facility in the Northwest, the officials began exploring the option of transferring Dodson to the United States Penitentiary in Marion, Illinois. When Dodson heard about this, he wrote to Warden García. *Id.* at Ex. L & M. From his letter, it is evident that Dodson and García discussed all the possible options that the prison authorities were weighing, including the option of transferring him to Marion. Dodson forewarned Warden García that if the M.D.C. transfers him to a federal penitentiary he will have to go "back to the hole" for his own protection from the Aryan Brotherhood. *Id.* Dodson did not like this option and pleaded with Warden García for a transfer to a prison near his family. On October 3, 1995, Warden García wrote a letter to Dodson's parents in which he acknowledged their concerns about Dodson's transfer to a federal penitentiary. *Id.* at Ex. K. He explained that the attempt to transfer their son to a facility in Washington had failed and promised them that "the BOP designator[s] follow established security precautions to ensure the safety of all inmates entrusted to the care of the Bureau." *Id.*

In spite of Dodson and his family's objections, on November 20, 1995 the M.D.C. requested Dodson's transfer to the United States Penitentiary in Marion, Illinois. *Id.* at Ex. B. On the transfer form, the officials stated that Dodson did not agree with the request. They indicated that Dodson is a drop-out of the Aryan Brotherhood who has been involved in several altercations with this group. *Id.*

The U.S.P. in Marion is a high-security institution that "houses male offenders committed from all parts of the country who have demonstrated a need for high security confinement. Typically, offenders have compiled serious records of institutional misconduct, have been involved in violent or escape-related behavior, or have lengthy and complex sentences that indicate they require an unusually high level of security." *Id.* at Ex. O. All units at the facility are "single-cell." *Id.* Furthermore, the prison contains a control unit for offenders who cannot function in the general population without threatening the security of the institution or the safety of inmates and staff members. *Id.*

In his complaint, Dodson argues that the M.D.C. request to transfer him to Marion was approved. He speculates that Warden García and the other co-Defendants held up the transfer after they learned that he filed the instant lawsuit. Dodson asserts that he learned about this from his case manager. He also alleges that Assistant Warden Tombone deliberately sabotaged the transfer requests to state prisons in Washington. *Id.* at 4. According to Dodson, Tombone has delib-

erately ignored the Aryan Brotherhood's threat to his safety and once told him:

> Look at the spiritual side Dodson. If you were brain dead and hooked up to life support, would you want to stay that way for 12 more years or have your family pull the plug.... Well, go to Marion. Get killed, and your family can sue the B.O.P. and that way you'de be giving them something in life.

*Id.* at 3; Pl.'s Mot., Dkt. No. 32 at 8–9. Dodson maintains that he has a zero chance of survival in Marion because the Aryan Brotherhood has a strong presence in the general prison population. Dodson fears that he would have to live in segregation from the remainder of the prison population in order to survive. Pl.'s Compl., Dkt. No. 1 at Ex. L.

The case manager coordinator has filed an affidavit contradicting Dodson's story. According to the case management coordinator, Jose Santana, the authorities rejected Dodson's transfer to Marion because Dodson did not meet certain criteria. Def.'s Mot., Dkt. No. 23 at Ex. A. In an affidavit, Warden García states unequivocally that the M.D.C. has no present intent to transfer Dodson to a federal penitentiary in the United States. Def.'s Mot., Aff. Warden García, Dkt. No. 23 at D. In fact, since the inception of this suit, the M.D.C. officials have again attempted to help Dodson transfer to a state facility in Washington. Unfortunately for Dodson, once again, this attempt failed. *Id.*

Dodson does not trust the M.D.C. authorities. He believes that Warden García and the other co-Defendants have in the past consciously disregarded and will continue in the future to consciously disregard the threat that the Aryan Brotherhood poses to his safety. In fact, he does not believe that the M.D.C. officials initiated a third request to transfer him to a state prison.

During the progression of this lawsuit, his requests for relief have varied. He has asked for: (1) an injunction to stop any possible future transfer to the U.S.P. in Marion, Illinois; (2) an injunction to stop Defendants from transferring him to any federal penitentiary in the United States; (3) a declaration that the M.D.C. is an unfit place for him because it is a pre-trial facility without sufficient rehabilitation programs; (4) an order requiring the M.D.C. to transfer him to a state facility near his home in Washington; (5) an order requiring the M.D.C. to provide him with *physical* access to the law library; (6) an order requiring federal officials to prosecute Defendants for violating his civil rights; and (7) monetary relief for the violation of his civil and constitutional rights.

Recently, Dodson's fear of a transfer to the U.S.P. in Marion has subsided. He informed the Court that he "concedes to the fact that at this point he will probably not be sent to U.S.P. Marion, Ill. [H]owever, without an order for injunctive relief, [which] should extend to *all* Federal penitentiaries, plaintiff will surely be transferred to a Federal facility at some point in the future." Pl.'s Mot., Dkt. No. 28 at 6.

## DISCUSSION

Defendants have moved for summary judgment on five grounds: (1) failure to serve a copy of the full complaint upon Defendants; (2) failure to serve the summons and complaint properly under Rule 4(i); (3) qualified immunity; (4) the doctrine of mootness; and (5) Dodson's inability to demonstrate Defendants' deliberate indifference.

### I. *Summons and Complaint:*

The Court quickly dismisses both of Defendants' claims related to the summons and the complaint because the arguments are meritless. Defendants' assertion that the Court should dismiss this suit because they never received the entire complaint when it was filed is simply inane. Defendants have had a copy of the entire complaint for several months and have had more than sufficient time to analyze Dodson's allegations to formulate a response. Most importantly, Defendants have not been prejudiced in any way, shape, or form by the failure to receive a copy of the full complaint.

Defendants' second argument for dismissal must be addressed before the Court can reach the merits of the case. Defendants move for judgment on the grounds that the Marshal's Office failed to properly serve

the summons and a copy of the complaint upon the United States of America pursuant to Rule 4(i). Even though Dodson never sued the United States of America directly, Defendants argue that the Marshal's Office must serve officers of the United States under the provisions of Rule 4(i). That would signify that the Marshal's Office would have to serve a summons on the United States Attorney for the District of Puerto Rico and mail the summons to the Attorney General of the United States in Washington, D.C.

Defendants, however, overlook the fact that Dodson is bringing a *Bivens* action against Defendants in their individual capacities. For *Bivens* suits brought against federal officers in their individual capacities, service of process must comply *only* with Federal Rule of Civil Procedure 4(e). Despite Defendants' insistence to the contrary, Rule 4(i)'s procedure is irrelevant. *See* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1107 at 163 (2d ed. 1987 & 1995 Supp.) (Rule 4(e) service of process sufficient when United States Officer is sued in her or his individual capacity); *Armstrong v. Sears,* 33 F.3d 182, 185–88 (2d Cir.1994) (same); *Robinson v. Turner,* 15 F.3d 82, 85 (7th Cir.1994) (same); *Parsons v. Aguirre,* 123 F.R.D. 293, 295–96 (N.D.Ill.1988) (same) Accordingly, the Marshal's Office served Defendants properly pursuant to Rule 4(e).

## II. *Mootness & Deliberate Indifference:*

### A. *Farmer v. Brennan:*

This leaves Defendants' argument for judgment on the grounds of qualified immunity,[3] mootness, and the failure to allege a sufficient case of deliberate indifference under the Eighth Amendment. Undoubtedly, the seminal case which controls the outcome of this dispute is *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Farmer,* the Supreme Court carefully explained the contours of an allegation of a prison official's "deliberate indifference" to the safety and well-being of an inmate pursuant to the Eighth Amendment.

Dee Farmer, a transsexual who enjoyed wearing women's clothing, took estrogen, and received silicone breast implants, was serving time in the United States Penitentiary in Terre Haute, Indiana. Prior to his transfer to Terre Haute, he had been segregated for his safety and because he violated prison rules. At Terre Haute, however, he was placed in the general prison population. Within two weeks, an inmate beat and raped him in his cell. Farmer filed a *Bivens* complaint alleging that the prison authorities consciously disregarded the risks to his safety in the general prison population despite their knowledge of prior assaults upon him because of his transsexual status. Farmer sought compensatory damages and an injunction prohibiting future confinement in a penitentiary.

The Supreme Court restated the well-established principle that prison officials must " 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (*quoting Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984)). This includes protecting the inmates against violence at the hands of other prisoners. *Id.* Having stripped prisoners of almost all means of self-protection and placed them in confinement with violent offenders, "the government and its officials are not free to let the state of nature take its course." *Id.* at 833, 114 S.Ct. at 1977. Prison officials may not subject inmates to " 'unnecessary and wanton infliction' of pain" which are " 'totally without penological justification.' " *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

Prison officials that do not take reasonable measures to ensure the safety of the inmates may be held liable for a violation of the Eighth Amendment. Before the Court finds that there is such a violation, the inmate must demonstrate that: (1) he is suffering or shall suffer from a deprivation which, when viewed objectively, is " 'sufficiently serious.' " *Farmer,* 511 U.S. at 833–35, 114 S.Ct. at 1977 (*quoting Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991)). In other words, "the inmate must

---

**3.** The Court never reaches the question of whether Defendants have qualified immunity.

show that he is incarcerated [or shall be incarcerated promptly] under conditions posing a substantial risk of serious harm." *Id.;* and (2) the prison officials have a "'sufficiently culpable state of mind.'" *Id.* (*quoting Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991)). The inmate must demonstrate that the prison officials have been deliberately indifferent to his or her safety. *Id.* The Supreme Court in *Farmer* explained that an official is deliberately indifferent only when the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837, 114 S.Ct. at 1979.

Prison officials, of course, can defend themselves effectively in one of at least the following three ways. First, they can show that "they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger." *Id.* at 844, 114 S.Ct. at 1982. Second, they might show that there was never any substantial risk of harm to the inmate. *Id.* Third, even assuming that they knew about the danger and that the injured inmate was in harm's way, they are not liable "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. at 1982–83. Prison officials are not responsible for preventing the unpreventable. So long as they act reasonably to protect the inmate's health and safety, they can not be found consciously indifferent.

An inmate does not have to be harmed before he or she can establish that the officials are consciously disregarding a substantial risk to his or her safety. *Id.* at 842–44, 114 S.Ct. at 1982. In cases where the prisoner is seeking injunctive relief because of a belief that the prison officials are disregarding an excessive risk to his or her safety that has not yet ripened into an actual injury, the Court determines whether the prison officials are consciously disregarding the risk "'in light of the prison authorities' current attitudes and conduct.'" *Id.* at 845, 114 S.Ct. at 1983 (*quoting Helling v. McKinney,* 509 U.S. 25, 25–27, 113 S.Ct. 2475, 2477, 125 L.Ed.2d

22 (1993)). The Court must examine their attitudes at the time that the lawsuit is brought *and* during the course of the litigation.

Significantly, "[a]n inmate seeking an injunction on the ground that there is a 'contemporary violation of a nature likely to continue,' must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, *and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm. and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.*" *Id.* at 845–46, 114 S.Ct. at 1983 (emphasis added). Plaintiff and Defendants may rely, therefore, on events which postdate the pleadings and pretrial motions to demonstrate the current attitudes and conduct of the prison authorities. A district court must "approach the issuance of injunctive orders with the usual caution" and, if appropriate, permit the defendants to rectify the situation before issuing injunctive relief. *Id.* at 846–48, 114 S.Ct. at 1984.

### B. Mootness Doctrine:

█ Dodson is seeking, *inter alia,* an injunction to stop Defendants from transferring him to the United States Penitentiary in Marion, Illinois. According to Dodson, Defendants were all set to transfer him to Marion until he filed the instant complaint. Despite the fact that Plaintiff's claim is purely speculative and contradicted by an affidavit of the case manager coordinator, for the purposes of Defendants' motion for summary judgment against an individual appearing *pro se* the Court shall assume that the allegation is true.[4]

---

4. The Court has held Dodson's requests for discovery in abeyance pending the outcome of Defendants' motion for summary judgment. Because the Court shall not delay its ruling on

Defendants' motion pursuant to Rule 56(f), the Court shall assume that Dodson's allegations regarding the transfer order to Marion are true.

Statements by Dodson himself, however, raise the question of whether his claim concerning the U.S.P. in Marion is moot. Dodson has conceded that "at this point he will probably not be sent to U.S.P. Marion" but may be transferred to another federal penitentiary in the future. Pl.'s Mot., Dkt. No. 28 at 6. " [W]hen the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome, the case is moot." *Boston Teachers Union, Local 66 v. Edgar,* 787 F.2d 12, 16 (1st Cir.1986) (*quoting County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). The controversy over Dodson's alleged transfer to Marion ended when either (a) the prison authorities denied the transfer request or (b) Defendants decided to suspend the transfer because of the instant lawsuit. In either case, the issue of Dodson's transfer to Marion is no longer "live."

Two well-established exceptions to the mootness doctrine, however, could have helped Dodson seek an injunction against a transfer to Marion. Under the first exception, Defendants' voluntary cessation of their alleged conduct does not render the controversy moot. *Id.* at 16–17. The exception prevents Defendants from stopping their illegal activities and then continuing them once the Court dismisses the complaint. Normally, this exception would assist Dodson in getting around the mootness doctrine. However, he has conceded that it is improbable that Defendants will transfer him to Marion in the future. Whether that concession is the result of his recognition that the transfer was never approved or the result of his lawsuit is not clear. But the concession does signify that the transfer to Marion is no longer a realistic possibility. The Court should not issue an injunction preventing the improbable. *See Farmer,* 511 U.S. at 846–47, 114 S.Ct. at 1984 ("Of course, a district court should approach issuance of injunctive orders with the usual caution"); *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979) ("the wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.") Accordingly, the first exception to the mootness doctrine does not help Dodson.

Under the second exception, Dodson must demonstrate that " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.' " *Local 66,* 787 F.2d at 17 (*quoting Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (1982)). Once again, Dodson's concession that Defendants will not likely transfer him to Marion in the future makes this exception inapplicable to his case. There is no reasonable expectation that Defendants will attempt to transfer Dodson to Marion in the future. *See also Newspaper Guild of Salem v. Ottaway Newspapers, Inc.,* 79 F.3d 1273, 1277–78 (1st Cir.1996) (finding no basis in the record to suggest that the action is likely to recur). As a result, the Court finds that Dodson's request for an injunction to prevent Defendants from transferring him to the United States Penitentiary in Marion, Illinois is **moot**.

### C. Objectively Serious Deprivation and Deliberate Indifference:

Five of Dodson's seven claims arise out of his fear that Defendants intend to transfer him to a federal penitentiary in the United States with conscious indifference to the threat posed by the Aryan Brotherhood. These claims include his requests for (1) an injunction to prevent a future transfer to the U.S.P. in Marion, Illinois, (2) an injunction to prevent a future transfer to any U.S.P. with members of the Aryan Brotherhood, (3) an order requiring Defendants to transfer him to a state penitentiary near his family, (4) an order requiring federal officials to prosecute Defendants for violating Dodson's civil rights, and (5) monetary damages for threatening to transfer him to Marion.

Dodson's proclaimed fear for his life is not feigned. He and his family have expressed a fear of the Aryan Brotherhood many times through letters and complaints. Pl.'s Compl., Dkt. No. 1 at Exs. L, N, P, O, & T. He has been assaulted by members of the Aryan Brotherhood in the U.S.P. in Lompoc and the U.S.P. in Atlanta. The prison authorities

clearly acknowledge that the threat is real. Dodson, unfortunately, can not establish the two principal elements of an Eighth Amendment violation for cruel and unusual punishment.

■ First, he has been unable to demonstrate that he is suffering from an objectively serious deprivation. Dodson must show more than the fact that Defendants intend to transfer him to Marion or any other federal penitentiary where there is an Aryan Brotherhood presence. He must demonstrate that the transfer poses a substantial risk to his safety. A mere "restrictive and even harsh" condition which does not rise to the level of a wanton and unnecessary infliction of pain is not a serious deprivation. *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399–2400.

A relevant example of a restrictive and tough but permissible restriction upon an inmate's freedom is the transfer of an inmate to a segregated, isolated unit of a penitentiary. The Supreme Court has repeatedly emphasized that courts should hesitate to interfere with the decisions to segregate and transfer prisoners. In *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979), the Court stressed that "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." Prison officials have a wide-ranging discretion to adopt the "policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878; *see also Sandin v. Conner,* 515 U.S. 472, ——, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995) ("federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"). This includes the decision to transfer inmates "to less amenable and more restrictive quarters for nonpunitive reasons." *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983).

Significantly, it also includes the decision to segregate an inmate to protect the prisoner's safety. *Id.; see also Santana v. Collazo,* 714 F.2d 1172, 1179 (1st Cir.1983) ("courts that have examined the confinement of adults in prison isolation cells have been reluctant to find them unconstitutional, based either on the length of confinement or on the possibility that isolation might cause psychiatric deterioration."), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). This explains why the Supreme Court in *Farmer* indicated that the segregation of the transsexual plaintiff from the general prison population would have been an acceptable measure to ensure the inmate's safety. 511 U.S. at 829–31, 114 S.Ct. at 1975.

Similarly, in *Jackson v. Meachum,* 699 F.2d 578, 581–84 (1st Cir.1983), the First Circuit followed Supreme Court precedent and held that an inmate placed in solitary confinement for his protection, because he was suicidal, and because he was an escape risk was not subjected to cruel and unusual punishment. Even though the confinement resulted in some degree of depression, the segregated unit provided satisfactory living conditions and did not impose wanton or unnecessary restraints upon the prisoner's liberties.

In light of these precedents, the proposed transfer of Dodson to the segregated wing of a federal penitentiary, which also houses the Aryan Brotherhood in the general prison population, is not a serious deprivation. In a letter to Warden García before filing the instant complaint, Dodson acknowledged that Defendants intended to transfer him to the segregated unit or, as he called it, "the hole" of a federal penitentiary. Pl.'s Compl., Dkt. No. 1 at Ex. L. Dodson complained that he had already spent twenty-two months in "the hole" on prior occasions and he strongly disliked the experience. Dodson overlooks, however, the Supreme Court precedents which emphasize deference to the security decisions of prison authorities. Should the M.D.C. officials transfer Dodson to a facility with less rehabilitation programs, less recreational time, and more restrictions, Dodson has no legal basis to complain. Similarly, should the M.D.C. officials transfer Dodson to the segregated, protective unit of the U.S.P. in Marion or any other penitentiary, Dodson has no legal basis to complain.

Upon close inspection, Dodson's fear of the Marion facility involves more than a fear for

his safety. Dodson is afraid of spending any more time in "the hole." The decision to isolate Dodson, however, is entirely reasonable and understandable. When the Aryan Brotherhood attacked Dodson in Lompoc and Atlanta, he was living in the general prison population. During his twenty-two months in isolation, in contrast, Dodson was protected from the Aryan Brotherhood's attacks. Because the Marion facility offers an unusually high level of security for inmates like Dodson, Defendants' decision to transfer him to the U.S.P. in Marion is not an objectively serious deprivation. On the contrary, it is a reasonable measure designed to ensure Dodson's safety and prevent an unstable, tense conflict between Dodson and members of the Aryan Brotherhood from erupting.

■ Second, even assuming that the transfer posed a substantial risk to Dodson's well-being, Dodson has been unable to establish that the prison officials have been consciously indifferent to his safety. Although it is understandable that Dodson is seeking an injunction before the Aryan Brotherhood attacks him again, it is quite clear that Defendants intended to transfer Dodson to the segregation unit of a United States Penitentiary. There, Dodson could be reasonably protected from the Aryan Brotherhood. Most importantly, the current attitude and conduct of Defendants since Dodson filed the instant lawsuit demonstrates that Defendants are doing everything but consciously disregarding the Aryan Brotherhood's threat to his safety. There is overwhelming evidence that Defendants are aware and concerned about the Aryan Brotherhood's threat to Dodson's safety.

In numerous prison documents, including the requests to transfer Dodson to a state penitentiary near Washington, Warden García's letters to Dodson and his family, Warden García's affidavit, and the Central Inmate Monitoring Report, Defendants recognized that special precautions would have to be taken to protect Dodson from the Aryan Brotherhood. Pl.'s Compl., Dkt. No. 1 at Exs. B, C, D, K, L, M, P; Defs.' Mot., Aff. of Garcá, Dkt. No. 23 at Ex. D. In fact, this was one of the principal reasons that the authorities transferred Dod-

son to the M.D.C. in Guaynabo, Puerto Rico where there is no Aryan Brotherhood presence. Defs.' Mot., Aff. of Garcá, Dkt. No. 23 at Ex. D.

Defendants' conduct on June 6, 1996 is symbolic of their current attitude toward Dodson's precarious situation. On this date, the Aryan Brotherhood issued orders to all active members of the group to execute its enemies, the members who are not in good standing, and the drop-outs. Apparently, the symbol of the Aryan Brotherhood is the clover leaf with the number 6 above each of the three separate leaves. On the sixth day of the sixth month of the sixth year in the 1990's, the Aryan Brotherhood celebrated its existence by issuing this ominous order to murder its enemies. As a result, Warden García and Captain Bruce Conger of the M.D.C. spoke with Dodson about his safety. They offered Dodson a chance to spend the day in segregation for his own protection. Pl.'s Mot., Dkt. No. 28 at 7. This is not an example of an obstinate, cold-hearted attitude. On the contrary, it represents an unequivocal concern for protecting Dodson.

Perhaps the best evidence of Defendants' concern for Dodson is their attempt to transfer him to a state penitentiary near his home in Washington. Defendants were not under any obligation to help Dodson. Yet, on June 12, 1995 and November 5, 1995, they requested the transfer. Although the transfers were not granted, Defendants' efforts to assist Dodson demonstrates their good intentions. Pl.'s Compl., Dkt. No. 1 at Ex. C, D, E, F, G, H, K, M.

The only indication that Defendants have consciously disregarded the Aryan Brotherhood's threat is the alleged comment made by Assistant Warden Tombone. According to Dodson, Tombone's statement to the effect that Dodson's death at the hands of the Aryan Brotherhood would be beneficial to his family is symbolic of Defendants' attitude. But this stray, isolated remark is insufficient to create a genuine issue of material fact on Defendants' attitude. Even if assumed to be true, Defendants' documented concern for Dodson's safety and recognition of the Aryan Brotherhood's threat belies Dodson's claim

that this comment is representative of their attitude.

■ The Court, therefore, shall not tie the hands of the prison authorities by issuing an injunction to prevent Defendants from transferring Dodson to any federal penitentiary in the United States. Dodson has not demonstrated that a transfer to a federal penitentiary even with the presence of the Aryan Brotherhood would constitute an objectively serious risk of injury. An assignment to the segregated section of the prison is a reasonable and effective measure to remove Dodson from harm's way.

Furthermore, if anything, the record demonstrates Defendants' concern for Dodson's safety and well-being. They are not disregarding the Aryan Brotherhood's potential threat. In fact, the opposite is true. By requesting his transfer to a state facility, issuing the Central Inmate Monitoring Report, keeping Dodson at the M.D.C. where there is no Aryan Brotherhood, and offering Dodson extra protection on June 6, 1996, Defendants have demonstrated a serious concern for Dodson's safety.

Finally, an injunction that broad would set a precarious precedent. It would severely restrict the ability of the prison authorities to run the federal prison system. It could even lead to the creation of a separate prison for drop-outs of dangerous gangs. Because some gangs like the Aryan Brotherhood have a presence in most, if not all, federal penitentiaries, a new prison would have to be created for the ex-members and enemies of these gangs. Forcing the prison authorities into creating a new prison or transferring the enemies of these gangs to state penitentiaries would be contrary to the purposes of the Eighth Amendment and Supreme Court precedent. It would return the courts to the dangerous role of regulating the daily activities of inmates in the federal prisons. Accordingly, the Court hereby denies Dodson's request to enjoin a transfer to the U.S.P. in Marion, to enjoin a transfer to any U.S.P. in the country, to order Defendants to transfer him to a state facility near Washington, to order the United States Attorney's Office to prosecute Defendants, and to award monetary damages for attempting to transfer him to Marion, Illinois.

### D. The M.D.C. and Dodson:

■ Dodson dislikes the M.D.C. He wants the Court to issue an order declaring that the M.D.C. is an unfit place for him. Dodson complains that the M.D.C. is a pretrial facility which does not have the types of rehabilitation programs that he wants. Unfortunately for Dodson, there is no constitutional or statutory right to rehabilitation programs. *Moody v. Daggett*, 429 U.S. 78, 88–89 n. 9, 97 S.Ct. 274, 279–80 n. 9, 50 L.Ed.2d 236 (1976); *Hoptowit v. Ray*, 682 F.2d 1237, 1254–55 (9th Cir.1982). He does not have the right to select the federal penitentiary or state prison where he would like to serve the remaining years of his sentence. The record demonstrates clearly that the M.D.C. has a small population of long-term inmates in addition to its pre-trial prison population. The Court finds, therefore, that the M.D.C. is a fit place for Dodson.

■ As the Supreme Court explained in *Meachum*, Dodson has no right to transfer out of the M.D.C. because it imposes more restrictive conditions than the state prisons in Washington where he would like to serve his time. *Meachum v. Fano*, 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976). "Transfers between institutions ... are made for a variety of reasons and often involve no more than informed predictions as to what would ... best serve institutional security or *the safety and welfare of the inmate*." *Id.* at 225, 96 S.Ct. at 2538 (emphasis added). The federal prison officials transferred Dodson to the M.D.C. for his protection and Dodson does not have either a constitutional or statutory right to force the officials to change their mind. *See* 18 U.S.C.A. § 4081 (1985) (providing federal prison officials with the discretion to classify and segregate prisoners).

■ Dodson also objects to the M.D.C.'s policy on access to the prison law library. Dodson may make as many requests for legal materials as he desires. However, neither he nor any other inmate may visit the library for security reasons. Dodson proclaims that

nothing less than physical access to the library is acceptable.

The Supreme Court's recent decision in *Lewis v. Casey,* — U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) shuts the door on Dodson's need for physical access. The *Lewis* Court reversed the lower court's decision to regulate the inmates' physical access to the law library. It criticized the district court's attempt to micro-manage Arizona's prison law libraries. The Court explained that to state a claim for the denial of the constitutional right of access to the courts, the inmate must demonstrate that: (1) the prison authorities restricted his or her access to legal materials or the courts in some material manner; *and* (2) the prison authorities' actions have hindered his or her effort to pursue a legal claim; *and* (3) the restrictions are not reasonably related to legitimate penological interests. *Id.* at —— —— ——, 116 S.Ct. at 2180–85. The prison authorities do not have to help the inmate "to *discover* grievances, and to *litigate effectively* once in court." *Id.* at ——, 116 S.Ct. at 2181. The constitutional right of access protects the inmate's capability of filing challenges to his or her prison sentence and conditions "rather than the capability of turning pages in a law library." *Id,* at ——, 116 S.Ct. at 2182.

*Lewis* clearly forecloses Dodson from proclaiming that Defendants have denied him and continue to deny him access to the courts. M.D.C. officials have not hindered Dodson from pursuing his legal claims. In fact, they have provided Dodson with copies of all the court decisions and statutory provisions that he requests. With these materials, Dodson has filed a comprehensive complaint and a variety of supplemental motions citing the relevant case law and constitutional authorities. Even if the Court assumed the absurd proposition that Dodson needs physical access to the law library to pursue his legal claims, the Court would reach the same result. Prohibiting physical access to the law library because of security reasons is reasonably related to one of the most legitimate penological interests, protecting the security of the inmates and the staff.

## CONCLUSION

Dodson is looking for a way out of the M.D.C. in Guaynabo, Puerto Rico. As an ex-member of the Aryan Brotherhood, he is also looking for protection from this ominous group. Dodson, however, has no statutory or constitutional right to select the federal or state facility where he must serve the remaining ten years of his prison sentence.

He has been unable to demonstrate that Defendants have exposed him or shall expose him to an objectively serious risk of harm. He has also been unable to show that Defendants' current attitude and conduct is indicative of their conscious disregard for his safety and well-being. The record, in fact, indicates the opposite. There is overwhelming evidence that the prison authorities and Defendants are highly concerned about the Aryan Brotherhood's threat to his life.

Accordingly, the Court hereby **grants** Defendants' motion. Dodson's complaint is hereby **dismissed with prejudice**, without costs and attorneys fees. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**